*Exhibit #4*

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:

NORTH AMERICAN CLEARING, INC.　　　　　Adversary No.: 6:08-ap-00145-KSJ

　　　　Debtor.
_____/

ROBERT N. GILBERT, Trustee,　　　　　　　Adversary No.: 6:10-ap-00151-KSJ

　　　　Plaintiff,

v.

RICHARD GOBLE,

　　　　Defendant.
_____/

## NOTICE OF FILING DEFENDANT'S EXPERT DISCLOSURES

Defendant RICHARD GOBLE ("GOBLE"), by his undersigned counsel, pursuant to this Court's June 23, 2011 Case Management Order, hereby files the Expert Report of Michael Brown.

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

Adversary No.: 6:10-ap-00151-KSJ

Dated: September 2, 2011  
Boca Raton, Florida

Respectfully submitted,

_____  
ERIC LEE (Bar No. 961299)  
lee@leeamlaw.com  
GINA GREENWALD (Bar No. 20288)  
ggreenwald@leeamlaw.com  
Lee & Amtzis, P.L.  
5550 Glades Road, Suite 401  
Boca Raton, FL 33431  
Telephone: (561) 981-9988  
Facsimile: (561) 981-9980 Fax  
**Attorneys for Defendant**  
**RICHARD GOBLE**

LEE & AMTZIS, P.L.  
ATTORNEYS AT LAW

2

Adversary No.: 6:10-ap-00151-KSJ

## SERVICE LIST
### (ECF)

Franck D. Chantayan, Esq.
Carlton Fields, P.A.
525 Okeechobee Blvd., Ste. 1200
West Palm Beach, FL 33401

Hywel Leonard, Esq.
Christopher M. Sacco, Esq.
Carlton Fields, P.A.
4221 W. Boy Scout Blvd., Ste. 1000
Tampa, FL 33607

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

**B/D SOLUTIONS CONSULTING**

# Expert Review and Opinion of the Financial Expert Witness Report prepared by Thomas Santoro, dated April for 2001

## Purpose

B/D Solutions Consulting has been engaged by counsel for Richard L. Goble to provide expert witness services in the matter of Robert N. Gilbert, Trustee v. Richard L. Goble. Specifically, Michael O. Brown, the founder and president of the B/D Solutions Consulting has been retained to provide an expert opinion as to the issues raised and conclusions made in the "Expert Analysis and Opinion re North American Clearing, Inc.", prepared and submitted by Thomas Santoro of GlassRatner Advisory & Capital Group, LLC ("GlassRatner") and dated April 4, 2011.

## Scope

For the purpose of this report the term "financial responsibility rules" shall mean to encompass the following Securities and Exchange Commission ("SEC") and Financial Industry Regulatory Authority ("FINRA ") rules and their related interpretive guidance.
- SEC Rule 15c3-1 - "The Net Capital Rule"
- SEC Rule 15c3-3 - "The Customer Protection Rule"
- SEC Rules 8c-1 & 15c2-1 – "Hypothecation Of Customers' Securities"
- SEC Rule 17a-3 – "Records To Be Made By Certain Exchange Members, Brokers & Dealers"
- SEC Rule 17a-4 – "Records To Be Preserved By Certain Exchange Members, Brokers & Dealers
- SEC Rule 17a-5 – "Reports To Be Made By Certain Brokers And Dealers"
- SEC Rule 17a-11 – "Notification Provisions For Brokers And Dealers"

## Qualifications and Background

My experience in the securities industry that began in 1984 when I was hired as a Compliance Examiner by the National Association of Securities Dealers, which in 2007 became The Financial Industry Regulatory Authority ("FINRA")[1]. During my employment as a Compliance Examiner my responsibilities included, among other things, the monthly review and analysis of broker-dealer financial statements, regulatory reporting and supporting documentation to determine the firm's compliance with the various "financial responsibility rules" of the Securities and Exchange Commission ("SEC"), FINRA and other regulatory agencies and corporations. The typical workload for a compliance examiner, including myself, during this time was to review and analyze the quarterly financial statements and FOCUS reports submitted by approximately 30 to 50 broker-dealers, with financial statements and focus reports submitted monthly by an additional 10 to 12 broker-dealers.

In addition to the in-office review and analysis of financial statements I also performed approximately two dozen on-site examinations per year of broker-dealers which included a determination of the firm's compliance or noncompliance with the financial responsibility rules, sales practice rules, trading and underwriting rules and various administrative regulations.

After leaving FINRA in 1987, I passed the Series 27 Qualification Examination, which is required for registration a Financial and Operations Principal ("FINOP")[2] I also obtained the Series 7 (General Securities Registered Representative), the Series 24 (General Securities Principal) the Series 4 (Options Principal), and the Series 53 (Municipal Securities Principal) licenses at that time.

---

[1] For purposes of clarity in this report, the regulatory authority will be referred to as FINRA regardless of the time period referenced.
[2] Pronounced "Fin-Op"

**B/D Solutions Consulting**                                                              Page 2

For the next seven years I was employed in a number of different capacities within a multi-broker-dealer organization. As the Manager of Compliance I was responsible for a staff of analysts who reviewed the activities of approximately 1200 registered representatives and conducted branch office examinations to determine compliance with sales practice rules and regulations. As the Financial Operations Principal & Controller of two affiliated broker-dealers I was responsible for compliance with all financial responsibility rules issued by the SEC, FINRA and MSRB including all regulatory financial filings. As the Director of Operations I was responsible for the back office brokerage operations for a firm with annual gross commission revenues of approximately $50 million and included responsibility over the trading desk, commission and payroll processing, and the correspondent relationship with the clearing firm.

In 1994 I became one of the founding partners of a securities compliance and operations consulting firm which focused on long-term project engagements to lead the implementation of strategic initiatives within large financial institutions. For example, we developed the regulatory and operational infrastructure for several regional money-center banks to operate "Section 20" broker-dealers activities (capital markets & investment banking) under a bank holding company. In addition, we assisted a bank, operating in 14 states, in building a self-clearing brokerage operation and to consolidate all securities activities conducted within the bank. This clearing operation then began providing clearance and settlement services to correspondent broker-dealers on fully disclosed and omnibus basis'.

For six years in the mid-1990's I served on FINRA's Series 27 & 28 Qualification Exam Review Committee. The purpose of the committee was too improve the fairness and effectiveness of the existing Series 27 & 28 exam questions which covered all financial and operational rules. As a committee, we crafted new questions and answers in response to the addition of new rules or changes in rule interpretations. The committee would analyze the statistical data generated for every question in the test bank to determine its accuracy, completeness and difficulty when compared to the desired outcomes (70% pass rate). Questions which did not meet the desired statistical model were removed, revised, or replaced and monitored to ensure the desired improvement.

Since, 1997 I personally have been registered with and have worked in the capacity of FINOP for over 30 different broker-dealers. As of the date of this report, I am registered as the FINOP with approximately 15 broker-dealers and am responsible for their financial regulatory reporting and their on-going compliance with the financial responsibility rules.

In addition to providing FINOP services, I and other consultants at B/D Solutions provide accounting, registration and licensing, and general compliance assistance to approximately 50 broker-dealers and registered investment advisors.

B/D Solutions Consulting will invoice for its employee's services contributed to this report on an hourly basis in accordance with the firm's standard rates currently in effect. These rates range from $275/hr for Mr. Brown's time and efforts, to $75 per hour for administrative support in preparing this report.

Case 6:10-cv-00408-PGB-KRS   Document 176-4   Filed 09/08/14   Page 6 of 19 PageID 2020
Case 6:10-ap-00151-KSJ   Doc 124   Filed 09/02/11   Page 6 of 13

**B/D Solutions Consulting**                                                                Page 3

### Summary of GlassRatner Opinion

As stated in the report submitted by Mr. Santoro, GlassRatner was retained for the purpose of: *"...rendering an opinion regarding whether North American Clearing, Inc ("NACI") had unreasonably small capital during the period of time that certain transfers were made by NACI to and for the benefit of Goble."*

Based upon his analysis, discussions, and his review of records and data, Mr. Santoro formed the following three primary opinions:

1. From May 2006 to May 2008, NACI made transfers at a time when it engaged in a business for which the remaining property of NACI was an unreasonably small capital;

2. From at least May 2006 to May 2008, NACI made frequent unauthorized redemptions from customer accounts of a material amount for the purpose of obtaining cash to pay for on-going NACI business obligations;

3. From at least May 2006 to May 2008, NACI did not have the ability to routinely pay its on-going business obligations when due from its own cash or capital sources;

### Summary of Applicable Regulations

The following are summaries of the major securities rules and regulations referenced in this report, but the reader is cautioned that the full scope of these rules is complex, with hundreds of pages of interpretive material issued by regulatory bodies over the years. This summary is meant to provide conceptual insight into the intent and purpose of these rules.

#### "The Customer Protection Rule" - 15c3-3

In 1972 the SEC adopted the Customer Protection Rule (which primarily only applies to broker-dealers which carry customer accounts, meaning funds and securities, on its books) and announced it was designed, in part, to accomplish the following purposes:[3]

- To make certain that customers' funds held by broker-dealers including funds to rise through the lending, hypothecation, and other permissible uses of customers securities, are used "in safe areas for the broker-dealers business relating to servicing its customers", or otherwise deposited into a reserve account

- To require brokerage firms promptly to obtain possession or control of all fully paid securities carried for the accounts of customers

- To effectuate the separation of the brokerage operation from that of dealer activities such as underwriting and trading

- To move the entire securities industry into and more efficient mode of operation prohibiting securities from being kept in unacceptable locations

- Two require broker-dealers to operate conservatively by way of limiting the expansion of their business through the use of customers' funds

---

[3] "Audit & Accounting Guide - Brokers and Dealers in Securities", American Institute of Certified Public Accountants, Inc.(AICPA) (c)2010

Case 6:10-cv-00408-PGB-KRS   Document 176-4   Filed 09/08/14   Page 7 of 19 PageID 2021
Case 6:10-ap-00151-KSJ   Doc 124   Filed 09/02/11   Page 7 of 13

**B/D Solutions Consulting**                                                                 Page 4

The objectives of the rule are accomplished through the two main sections of the rule which require broker-dealers to:
- Obtain possession or control of fully paid and excess-margin customer securities, and

- Establish a "Special Reserve Bank Account for the Exclusive Benefit of Customers", and compute a reserve formula to determine the minimum balance of customer funds which must be maintained in the account

### "The Net Capital Rule" - 15c3-1

In 1975 the SEC adopted the Net Capital Rule (which applies to all broker-dealers) in order to create a uniform capital requirement to ensure the liquidity of the broker-dealer industry. The rule requires each broker-dealer to maintain a minimum level of liquid assets based on the volume type and risk exposure of the business activities in which it is engaged. This minimum liquidity level or "Net Capital" is determined through the following mechanisms:

- Each broker-dealer must deduct from its net worth (equity) numerous adjustments which are meant to take into effect the liquidity of the firm's assets, the volatility and uncertainty of the markets, operational risks inherent in the securities industry, the efficiency and accuracy of its own operation and to remove any equity derived from certain accounting practices which bear no monetary contribution.

- Each broker-dealer has a minimum net capital requirement which is calculated based upon the individual broker-dealer's current and future payment obligations —or— its level of customer related receivables

- Each broker-dealer is subject to an 'absolute' statutory minimum net capital requirement based on the risk and complex of its business activities

### "Reports To Be Made By Certain Brokers and Dealers" - 17a-5

Sometimes referred to as the FOCUS rule, SEC Rule 17a-5 requires all broker-dealers to file a uniform financial report, referred to as a FOCUS Report, on a calendar quarter basis. Firms which conduct market making or proprietary trading and/or carry customer funds and securities are required to file a more extensive focus report on a monthly basis.

The quarterly FOCUS report consists of a detailed balance sheet, income statement, statement of changes in equity, a calculation of minimum required net capital, and a calculation of the firm's net capital position. The monthly FOCUS report includes this information plus a detailed amounting of the reserve formula used in calculating the amount required to be on deposit in the Customer Reserve Account.

All FOCUS reports are submitted electronically and the numbers are subjected to electronic analysis for errors, omissions and negative trends, which creates "red flag" reports when a parameter is broken. These red flag reports are routed to the FINRA staff examiner who is assigned to monitor the financial health and general compliance performance of the firm. The FINRA examiner is then required to contact the firm and inquire about the cause of the red flag issue and determine what corrective action may be necessary.

Case 6:10-cv-00408-PGB-KRS   Document 176-4   Filed 09/08/14   Page 8 of 19 PageID 2022
Case 6:10-ap-00151-KSJ   Doc 124   Filed 09/02/11   Page 8 of 13

**B/D Solutions Consulting**                                                                    Page 5

**B/D Solutions' Opinion**
Based on my review of the conclusions made by the GlassRatner report I have reached the following opinions:

Opinion 1
It is my opinion that the author of and contributors to the GlassRatner report are not intimately familiar with the nuances and complexities of either SEC Rule 15c3-1 ("The Net Capital Rule") or SEC Rule 15c3-3 ("The Customer Protection Rule") as they pertain to self-clearing broker-dealers such as NACI.

Opinion 1: Supporting Basis & Reasons
1-A.   According to the FINRA BrokerCheck service, Mr. Santoro of GlassRatner, and two of the three principals of Financial Industry Technical Services, Inc. ("FITS") upon which he relied for his opinion, have never been registered personnel within the securities industry (the third individual, Mr. Hargrove was registered with a broker-dealer only between 2007 and 2009).  More importantly, none of these four individuals appears to have ever been registered in the capacity of Financial & Operations Principal.  Every broker-dealer is required to have a properly qualified Financial & Operations Principal registered and operating in that capacity.  Prior to being registered as a firm's FINOP, the individual must successfully pass the Series 27 qualification examination[4].  This exam tests the individuals detailed knowledge of both SEC Rule 15c3-1 and Rule 15c3-3 and the other financial responsibility rules.  FINRA membership rules require any individual who is designated as the CFO of a broker-dealer to qualify by passing the Series 27 examination and having one year direct or two years indirect experience with the financial responsibility rules.

Without the requisite qualification examination and experience of being personally responsible for a firm's on-going compliance with the various complex financial responsibility rules listed above, it is unclear how they arrived at the opinions expressed in the report.

1-B.   In the report, there are incorrect citations of securities regulations, the use of uncommon terminology, the use of broad generalizations to describe complex regulations, and the use of accusatory statements without factual support.  Specifically, in the section of the report entitled, *"Compliance with SEC Rules Regarding Customer Cash Reserves and Uniform Net Capital Rule"*...

- The report repeatedly cites "SEC Rule 15c-3" however there is no such SEC rule. Although he does not cite the rule by its common name, the correct citation is SEC Rule 15c3-3, also known as the "Customer Protection Rule". Furthermore, there is no SEC rule with a title or that is commonly known as "Customer Cash Reserves" as used in the section title.

- The report lumps SEC Rule 15c3-3 (the Customer Protection Rule) and SEC Rule 15c3-1 (the Net Capital Rule) together and will "...refer herein to the two SEC Rules as 'the Rule'...". These two rules are two very separate and distinct rules with separate and distinct purposes and are never considered or classified as a single citation by knowledgeable persons closely familiar with the complexities of each rule and their intended purposes.

- The report states –*"If a broker-dealer is not in compliance with one or both of the Rules, it is restricted from operating and conducting business. The Rules are in place to ensure that a broker-dealer can meet its obligations to customers and other creditors. The SEC has stated the net capital rule is intended to require "every broker-dealer to maintain at all times [emphasis added] specified minimum levels of liquid assets, or net capital, sufficient to enable a firm that falls below its minimum requirement to liquidate in an orderly fashion.".*

---

[4] The Series 27 exam is required for firms which carry customer accounts, such as NACI. The Series 28, which focuses less on the Customer Protection Rule is acceptable for non-self clearing firms.

Case 6:10-cv-00408-PGB-KRS   Document 176-4   Filed 09/08/14   Page 9 of 19 PageID 2023
Case 6:10-ap-00151-KSJ   Doc 124   Filed 09/02/11   Page 9 of 13

**B/D Solutions Consulting**                                                                    Page 6

While it is true that broker-dealers are required to maintain sufficient net capital at all times, it is misleading to imply that to this is to enable a firm to "liquidate in an orderly fashion" as the only reason. This over-simplification may lead the reader to conclude that the Net Capital Rule requires a firm to liquidate when its capital falls below its minimum requirement, but this is not the case. Both the Net Capital Rule and the Customer Protection Rule allow for corrective actions to be taken when a problem is discovered. For example, the financial responsibility rules have "early warning" thresholds for net capital, and there are reasonable timeframes to "clean-up" aged operational items such as a failure to deliver or other receivables due firm.

Opinion 2
It is my opinion that the author of and contributors to the GlassRatner report are not intimately familiar with the back-office operations of a securities firm which carries and finances customer accounts for other broker-dealers who place customer accounts with the clearing firm on a fully disclosed basis.

Opinion 2: Supporting Basis & Reasons
2-A.   The section of the report entitled "Line of Credit", implies that the existence of and the repeated use of a bank line-of-credit demonstrates the fact that NACI had "unreasonably small capital". Specifically the report states:

*"NACI had a line of credit facility with US Bank collateralized with customer margin account securities. The line of credit totaled $15 million and $25 million at December 31, 2006 and 2007, respectively. This line of credit was NACI's sole additional source of capital besides its own cash holdings".*

*"NACI could make borrowings on the line of credit based on the amount pledged of non-fully or partially paid securities. The maximum "availability" under the line was based on the total non-fully or partially paid securities available at market less valuation adjustments determined by US Bank."*

- The report fails to mention that pledging margined customer securities as collateral for one or more bank loans is the standard and typical financing mechanism utilized by all clearing broker-dealers. It also fails to mention that clearing firms borrow to settle their customer purchase transactions with other broker-dealers from which they purchased those securities – but which the customer has not fully paid them for. While a clearing firm is extending credit to the margin customer, it is also charging margin interest to that customer for that credit. The firm increases its profits by the difference of the interest charged by the bank on the loan and the interest rate charged by the firm to the customer for the margin loan. The use of a bank loan or line of credit actually increases the firm's profitability and is not, by itself a sign of undercapitalization.

- The report states several times that the fact that NACI occasionally was overdrawn on its bank line credit and subsequently paid down the loan is evidence of that NACI had unreasonably small capital. The facts stated in the report are misleading because the report misclassifies the situations as being overdrafts on loan account, when a more accurate description would be that the loan account was under-collateralized. Having a collateral deficiency in bank lines collateralized by customer partially paid securities is not uncommon and can be rectified in two ways; 1- pay down the loan balance or 2- pledge additional securities to cover the loan balance. The report fails to determine if additional securities were available to be pledged in the situations cited or if the firm simply decided to pay down the loan balance to a level supported by the collateral already pledged.

Case 6:10-cv-00408-PGB-KRS   Document 176-4   Filed 09/08/14   Page 10 of 19 PageID 2024
Case 6:10-ap-00151-KSJ   Doc 124   Filed 09/02/11   Page 10 of 13

**B/D Solutions Consulting**                                                                 Page 7

- Finally, there is also no evidence that the line of credit was the "sole additional source of capital" for NACI. In fact, Appendix D of Rule 15c3-1 defines "Satisfactory Subordination Agreements" which are lending arrangements that provide broker-dealers with methods for obtaining capital specifically for the purpose of increasing the firm's net capital as defined by Rule 15c3-1. The report makes no mention if this option was being explored by the firm.

Opinion 3
It is my opinion that the GlassRatner report wrongly concludes that –
*"We believe that NACI's recurring practice of using unauthorized redemptions over an extended period of time to pay its on-going operating cash needs is clear and compelling evidence that NACI had unreasonably small capital.*

Opinion 3: Supporting Basis & Reasons
3-A.   First and foremost, the report uses the incendiary term "unauthorized redemptions" over 25 times to refer to the liquidation of customer money market positions into an interest bearing free credit balance. The expert report fails to address the basis used to reach the conclusion WHY such redemptions were unauthorized.

The report also failed to mention the following facts:
- The authorization for such redemptions was part of the customer account disclosures provided to the customer at the time of opening his/her account, and

- The redemptions and purchases were confirmed to the customer at the time of the transaction, and,

- The monthly account statements had disclosures informing customers to bring any "unauthorized" or erroneous activity in their accounts to the attention of the customer's retail brokerage firm, and,

- There is no evidence that any claim of unauthorized transactions was ever made by any customer, and,

- Customers earned and received exact comparable interest rates regardless of the redemptions, and,

- The cash (free credit balance) never was removed from the customer's account.

It is clear that the report fails to support the accusation of any unauthorized activity by NACI.

3-B.   In addition, in the Bench Trial Opinion in the SEC's case against NACI, Mr. Goble, et.al - the judge concluded *"...the evidence did not establish which, if any, of the sweeps were conducted without customer authorization".*

- If the evidence amassed by the SEC and presented at trial failed to establish that such redemptions were unauthorized, then it is clear that the methodology used by FITS to identify and categorize redemptions as unauthorized is flawed and circumstantial at best. One example of the flawed FITS methodology is that it considers any redemption which is not immediately followed by a cash distribution to the customer as unauthorized. This fails to consider the common practice of liquidating positions in anticipation of future cash needs or the liquidation in anticipation of transferring the account to another brokerage firm.

Case 6:10-cv-00408-PGB-KRS   Document 176-4   Filed 09/08/14   Page 11 of 19 PageID 2025
Case 6:10-ap-00151-KSJ   Doc 124   Filed 09/02/11   Page 11 of 13

**B/D Solutions Consulting**                                                                 Page 8

3-C. The report presents no documentation that the cash balances generated by the redemption of customer money market sweep positions was used by NACI to "...*pay its on-going operating cash needs...*".

- The report claims cash from customer accounts *was* used to pay operating expenses of NACI as early as 2006, AND claims the firm had unreasonably small capital, AND claims the firm was experiencing increasing financial losses, AND claims the firm had maxed out its secured line of credit, AND claims Mr. Goble could not obtain an unsecured line of credit AND claims the firm had no other sources of additional capital – but the report fails to answer HOW, over the course of the two year period claimed in the report, did the firm replace the cash into the customer's accounts that it had allegedly spent on operating expense? Since no mathematical explanation can be given, then one or more of the claims made must be false.

3-D. The report uses the terms fraudulent or fraud approximately a dozen times to describe the actions of NACI and/or Mr. Goble with regard to the "*...cash fraudulently obtained from unauthorized customer redemptions...*"

- The report fails to cite any specific violation of securities rules which these redemptions triggered – and without a violation of securities laws, the use of the term fraud or fraudulent is solely pejorative and demonstrates the lack of knowledge of the securities industry and its operations and capital structure.

- In the Bench Trial Opinion, the Judge wrote: *"Similarly, on cross-examination, the SEC's own expert witness, Mr. Luque, backtracked from statements made in his expert report and conceded that he found no evidence that Defendant Goble had committed securities fraud".*


Opinion 4
It is my opinion that the author of the GlassRatner report, in concluding NACI had "unreasonably small capital", is not supported by the facts. The report failed to consider the numerous safeguards and conservative interpretive guidelines issued by the SEC which are used in calculating a firm's net capital position, and in determining the balance which must be "locked up" in the customer reserve account.


Opinion 4: Supporting Basis & Reasons
4-A. The net capital computation established by the SEC sets a very harsh treatment of the value of assets in determining net capital. Compliance with the net capital rule is evidence that a broker-dealer has "reasonable and sufficient capital".

- For example, no credit what so ever is given for fixed assets, including real estate, equipment, computer installations, software, licenses, etc, etc. These are assets a non-broker-dealer routinely would include in their determination of capital or in valuations.

- Even the value of liquid assets (such as listed equity securities, government and municipal securities) are "haircut" under the net capital rule by up to 30% of their market value. Plus, there are additional haircuts required to the asset's value if the asset comprises more than a certain percentage of the firm's capital.

- The net capital rule and the customer protection rule give diminishing or no value to aging operational assets. For example, the failure to collect receivables from other broker-dealers, and failures to deliver securities on time, and failures obtain possession and control of securities all have negative effect on both the net capital computation and the customer reserve formula. In short, when a firm does not clean-up its operational problems, it must have additional capital on reserve.

Case 6:10-cv-00408-PGB-KRS   Document 176-4   Filed 09/08/14   Page 12 of 19 PageID 2026
Case 6:10-ap-00151-KSJ   Doc 124   Filed 09/02/11   Page 12 of 13

**B/D Solutions Consulting**                                                               Page 9

- The net capital rule also restricts a firm from excessive indebtedness and imposes debt/equity ratios far above levels generally considered conservative in other industries.

- As for the Customer Protection Rule, it requires firms have a 40% cushion on the collateral underlying its lending mechanism. Even for the cash position in the customer reserve account the firm must have on deposit 5% more than the cash that would be needed to "cash out" its customers.

Therefore, the conclusion that NACI had "unreasonably small capital" from 2006 through May of 2088 is not just unfounded but incorrect. As evidenced by the FOCUS reports submitted to, reviewed and analyzed by FINRA each month, the firm exceeded the strict net capital, liquidity and reserve requirements set forth by the SEC rules, regulations and interpretations.

### Summary of B/D Solutions' Opinions

In summary, the following are my opinions of the conclusions drawn by Mr. Santoro in the GlassRatner expert witness report:

1. From May 2006 to May 2008, NACI made transfers at a time when it engaged in a business for which the remaining property of NACI was an unreasonably small capital;

Opinion
No evidence is presented that NACI was not in compliance with the financial responsibility rules promulgated by the SEC and therefore, by definition had reasonable sufficient capital.

2. From at least May 2006 to May 2008, NACI made frequent unauthorized redemptions from customer accounts of a material amount for the purpose of obtaining cash to pay for on-going NACI business obligations;

Opinion
No evidence is presented that NACI was in violation of any securities rule regarding the redemptions, nor is any evidence presented demonstrating any prohibited use of customer funds for any purpose.

3. From at least May 2006 to May 2008, NACI did not have the ability to routinely pay its on-going business obligations when due from its own cash or capital sources;

Opinion
No evidence is presented that NACI ever used anything but its own assets to pay its on-going expenses.

Respectfully submitted on September 1, 2011

*Michael O. Brown* (signature)
Michael O. Brown
President – B/D Solutions Consulting

Case 6:10-cv-00408-PGB-KRS   Document 176-4   Filed 09/08/14   Page 13 of 19 PageID 2027
Case 6:10-ap-00151-KSJ   Doc 124   Filed 09/02/11   Page 13 of 13

**B/D Solutions Consulting**                                                                 Page 10

**Addendum to B/D Solutions Report**
The following is a list of documents that have been used to summarize or support the opinions herein.

- "Expert Analysis and Opinion re North American Clearing, Inc. (NACI), Relating to Robert N. Gilbert, Trustee v. Richard L. Goble, April 4, 2011"

- North American Clearing, Inc.
    - Monthly FOCUS Reports –Form X-17A-5, Part II (June 2006 through April 2008
    - Customer Reserve Computations (January 7, 2006 through May 31, 2008)
    - Audited Financial Statements (December 31, 2006 & 2007)

- NASD Examination Letter to John Busacca – September 5, 2006

- Bench Trial Opinion - Re: SEC v. NACI, Richard Goble, Bruce Blatman and Timothy Ward

- "Audit & Accounting Guide - Brokers and Dealers in Securities", American Institute of Certified Public Accountants, Inc. (AICPA) (c)2010

- Securities Operations – 2nd Edition, New York Institute of Finance , (c)1996


Attached is a description of the witness's qualifications, including a list of all publications authored in the previous 10 years.


Attached is a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition.


A statement of the compensation to be paid for the study and testimony in the case has been included on page 2 of the report.

# B/D SOLUTIONS CONSULTING

www.bdsolutions.com

**BIOGRAPHY**  **Michael O. Brown**
mobrown@bdsolutions.com

As the founder and president of B/D Solutions ("BDS"), Mr. Brown has assisted the principals of broker/dealers and registered investment advisor firms in meeting their regulatory obligations and responsibilities in four key areas of expertise.

- Broker-dealer and investment advisor start-up services
- Brokerage accounting and FINOP services
- Compliance and registration services
- Litigation support and expert witness services

B/D Solutions has guided its clients through the increasingly complex maze of securities regulations, rules and laws. At the same time, BDS has developed strong relationships with regulatory personnel and maintains a full understanding of the regulatory process. In short, B/D Solutions knows _what_ is required by the regulations, _when_ it is required to be done, and most importantly, _how_ to get it done. This results in BDS clients having more bandwidth to focus on running their businesses, and at the same time reducing their exposure to regulatory violations and possible enforcement actions.

Prior to B/D Solutions, Mr. Brown worked as the Investment Products Manager for S1 Technologies. Security First is the software subsidiary of Security First Network Bank which in 1996 was the first true secure internet-based bank and Mr. Brown was responsible for the implementation of the bank's on-line brokerage application.

Prior to SFNB, Michael was a founding partner of The Dover Group - a brokerage consulting firm formed in 1994. Dover focused on the bank broker/dealer segment and the formation of Section 20 Capital Markets broker/dealer operations, clearing conversions and developing system interfaces.

From 1987 until 1994, Mr. Brown was employed by Financial Service Corporation ("FSC"). In 1989, FSC was sold to its management by Mutual of New York for $1, and as part of the management team, he helped change an unfocused, inefficient and unprofitable subsidiary into a profitable and growing customer-focused financial service company. In 1997, FSC was sold to SunAmerica for $57 million and is now a part of the AIG Advisor Network. During his tenure at FSC, his responsibility was to continuously restructure and implement improved productivity and morale within the company's operating units and he held the positions of Compliance Officer, Comptroller, Financial Principal, and Director of Operations.

Michael's career in the securities industry began in 1984 as a Compliance Examiner with the NASD (now FINRA) district office in Atlanta. Auditing broker/dealers taught him the real details of back office operations and broker/dealer accounting and gave him the insight on how automation can be the key to effective compliance operations. While with the NASD, Michael was appointed to task forces which developed examiner training programs, examined the specialized Puerto Rican bond markets, and worked on a task force to curb penny stock sales fraud.

Mr. Brown is frequently engaged as an expert witness by investment firms for arbitration and litigation cases involving the implementation of compliance procedures, the effectiveness of supervision systems, and the adequacy of operational controls. He also provides his expertise to investors, whom he believes have been egregiously harmed by the actions or inactions of some firms. For over six years, Michael served as a member of the NASD Examination Review Committee to re-write the Series 27 & 28 examinations for Financial and Operations Principals. His current FINRA exam qualifications include the Series 4, 7, 24, 27, 53, 79 and 63.

Mr. Brown graduated from Purdue University in 1982 with a Bachelor of Science degree in Management and Finance and currently volunteers as a career mentor for Purdue students from the Atlanta area. He also has served as an advisor to the Krannert School Alumni Association.

When not working, Michael spends most of his free time (and money) rehabbing his home in the Buckhead community of Atlanta, and riding his motorcycles through the north Georgia mountains.

4060 Peachtree Rd • Suite D-322 • Atlanta Georgia 30319
404-303-8840 • Toll Free 877- 4BD-INFO o Fax 404-250-9972

 **CONSULTING**

# Michael O. Brown

### Expert Witness & Litigation Support  -  Case Summary

## Thomas Weisel Partners LLC (TWP) vs. McDonald Information Service, Inc.(MIS)

*Forum:*
  Superior Court of California - 2010

*Engaged by:*
  Defendant's counsel – Ericksen Arbuthnot, Oakland CA.

*Claim:*
  Breech of Contract, Intentional and Neglect Misrepresentation

*Summary:*
  TWP submitted name of potential new customer to MIS who failed to provide information regarding the prior arrest, conviction and prison term on federal money laundering charges. Customer subsequently placed trades and walked away from $5 million loss in the account.

*Participation:*
  - Review and analysis of applicable supervisory procedures and company policies
  - Advise counsel on standard of care in opening brokerage accounts and accepting unsolicited orders
  - Review transaction documents and depositions

*Testimony:*
  - Case pending CA mandatory mediation review


## Megibow vs. AmSouth Investment Services (AIS)

*Forum:*
  NASD Arbitration - 2006

*Engaged by:*
  Defendant's counsel – Balch & Bingham LLP, Birmingham AL.

*Claim:*
  Slander and false statements made by AIS via Form U5

*Summary:*
  Registered Representative was terminated by bank broker/dealer after conducting trades which appeared to have violated NASD Rules and AIS procedures & policies

*Participation:*
  - Review and analysis of applicable supervisory procedures and company policies
  - Review transaction documents and depositions
  - Attendance at hearing and critique of defense testimony

*Testimony:*
  - Firm's procedures and policies were comparable with industry standards and practices
  - Firm was required to file Form U5 properly indicating "termination for cause"
  - Firm used appropriate language on Form U5 which was not inaccurate, misleading or false

---

Case 6:10-cv-00408-PGB-KRS   Document 176-4   Filed 09/08/14   Page 16 of 19 PageID 2030
Case 6:10-ap-00151-KSJ   Doc 124-2   Filed 09/02/11   Page 2 of 5

Case Summary - Michael O. Brown

### *The United States vs. Moses*

*Forum:*
US Northern District Court - 2006

*Engaged by:*
Defendant's counsel – Martin Brothers, PC, Atlanta GA.

*Claim:*
Perjury relating to the issuance of false press releases, resulting in stock manipulation and personal enrichment

*Summary:*
President & shareholder of research company, issued press releases which were misleading, causing increase in stock price, and sold shares at the inflated price

*Preparation:*
- Advised criminal defense attorney on SEC and NASD Rules
- Assisted in crafting language to target discovery requests
- Analyzed, charted and summarized 10,000+ market transactions in a single issue of stock
- Determined actual profit/loss of market participant groups (loss classes)
- Analyzed Defendant's brokerage activity, including profit & loss, receipt & delivery of restricted and non-restricted securities, cash in & out, historical trade patterns & timing
- Evaluated best execution of block sale transactions

*Testimony:*
- Market data collected by Prosecution was incomplete, inaccurate and unreliable for determination of damages to investors
- Calculation used by Prosecution's expert witness was unreasonable and illogical based on securities industries standards and practices
- Pattern of unrestricted stock sales existed for more than 1 year prior to period in question

### *Robison vs. Merrill Lynch (ML)*

*Forum:*
NASD Arbitration - 2005

*Engaged by:* (pro bono)
Plaintiff's counsel – Ramsey & Associates LLC, Birmingham, AL.

*Claim:*
Unsuitable transactions, failure to disclose fees and commissions

*Summary:*
Disabled, single mother of three, transferred retirement account of $80,000 to ML which charged commissions to liquidate entire holdings and converted the account to a fee based account charging annual advisory fees. The advisory account focused on frequent trading in technology stocks which lost 75% of value in 2 years.

*Participation:*
- Advised non-securities attorney on pertinent SEC and NASD rules and Investment Advisor regulations
- Assisted with wording and scope of discovery requests
- Reviewed communications & disclosures to customer regarding transfers & transactions
- Analyzed calculations made by financial planning software
- Determined parameters used by compliance surveillance system

*Testimony:*
- Total liquidation of positions in 401(k) account increased risk unnecessarily
- Technology focused asset management account was an unsuitable investment vehicle
- Disclosure of commissions and advisory fees was incomplete and inaccurate
- Compliance review could be circumvented by manipulating planning software input

Case 6:10-cv-00408-PGB-KRS   Document 176-4   Filed 09/08/14   Page 17 of 19 PageID 2031
Case 6:10-ap-00151-KSJ   Doc 124-2   Filed 09/02/11   Page 3 of 5

Case Summary - Michael O. Brown

### *Hansen vs. Dain Rausher et al*

*Forum:*
   NASD Arbitration - 2004

*Engaged by:*
   Plaintiff's counsel - Lionel Sawyer & Collins, Las Vegas, NV.

*Claim:*
   Inadequate procedures and failure to follow procedures regarding registration changes and asset transfers for guardianship accounts

*Summary:*
   Assets were liquidated and transferred from and account registrations changed on accounts of a comatose adult customer by his father without proper documentation or authorization by *customer's estate*

*Participation:*
   - Advised family law attorney on SEC & NASD Rules and industry standards
   - Assisted in wording and scope of discovery requests
   - Reviewed documentation and authority used to liquidate assets and transfer funds
   - Reviewed policies and procedures for guardianship account registration changes

*Testimony:*
   - Procedures were inadequate for transfer of accounts and/or liquidation of assets
   - Documentation presented was lacking industry standards of authority
   - Firms failed to maintain adequate records documenting operations


### *Binary Traders vs. Schroeder*

*Forum:*
   NASD Arbitration - 2002

*Engaged by:*
   Plaintiff's counsel - Fineman & Bach PC, Philadelphia, PA.

*Claim:*
   Inadequate procedures, failure to enforce procedures, failure to supervise

*Summary:*
   Broker/dealer customer placed trades with PHLX floor broker, who bundled and executed trades, allocating profitable trades to accounts he controlled and unprofitable trades to accounts of his customers

*Participation:*
   - Advised attorneys on back office and clearing firm operations
   - Advised on NASD and PHLX Uniform Practice Code
   - Assisted in discovery requests
   - Analyzed trading profits & losses and allocation based on transaction instructions
   - Reviewed correspondence and internal review documents
   - Compared actions taken to procedures

*Testimony:*
   - Definition of Associated Persons
   - Obligation of Firms to supervise Associated Persons
   - Obligation of Firms to supervise trading accounts and trading brokers
   - Firm failed to implement independent financial controls on trading activity
   - Firm failed to act upon recognition of inappropriate activity

Case Summary - Michael O. Brown

### *Bacon vs. Dean Witter*

*Forum:*
NASD Arbitration - 2002

*Engaged by:*
Shumacker Witt Gaither & Whitaker, Chattanooga, TN

*Claim:*
Failure to Supervise

*Summary:*
Elderly customer (102 yrs old!) was granted unrestricted access to branch office and permitted to place excessive unquestioned trades based on watching a delayed tape and reading of periodicals available in the lobby. Analysis showed the $800,000 portfolio was turned over 20X times, losing $212,000 while generating $257,000 in commissions

*Participation:*
- Preformed detailed account analysis of profit/loss, cash in/out, turnover rates, and commissions generated
- Reviewed and critiqued Written Supervisory Procedures
- Reviewed transaction documents and internal correspondence
- Critiqued depositions of branch manager and administrative employees

*Testimony: (written opinion, settled prior to testimony)*
- Firm had obligation to review and approve transactions regardless of origination
- Firm failed to review activity in customer account
- Firm failed to exercise reasonable care on customer account and activity
- Firm failed to have adequate surveillance to detect potential problem accounts

### *Tedrow vs. Fidelity Investments*

*Forum:*
Civil Court, Denton County, Texas 1999

*Engaged by:*
Plaintiff's counsel - Kelsey, Kelsey, & Collister, Denton, TX

*Claim:*
Failure to provide best execution, unauthorized trading, inaccurate disclosures and confirmations of transactions

*Summary:*
Customer conducted mutual fund trade via Fidelity's automated telephone order entry system during a market trading halt triggered by a NYSE "circuit breaker" due to extreme market volatility. The transaction was confirmed on the automated system and in writing, but never executed until 4 days later resulting in a loss to the customer. Through discovery it was found that improper programming of software caused 462 investor transactions not to be executed as confirmed.

*Participation:*
- Advised non-securities attorney on the requirements of pertinent SEC and NASD Rules
- Reviewed transaction disclosure documents and telephone system scripts
- Analyzed fund prospectus and SAI for disclosures of timing and execution
- Evaluated Defendant's compliance with mutual fund pricing rules

*Testimony:*
- SEC rules require the consistent method and timing for pricing of mutual fund shares
- Market halts do not change the timing of pricing requirements
- Fidelity's automated system did not properly execute, price or confirm transactions in accordance with the SEC rules
- Fidelity's automated system confirmed non-existent trades and then placed unauthorized trades when discovered

Case Summary - Michael O. Brown

## ATTORNEY REFERENCES:

**Alan M. Wolper**
Locke Lord Bissell & Liddell LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0401

**Kirk Montgomery**
Senior Counsel - Wells Real Estate Funds
6200 The Corners Parkway - Suite 250
Norcross, Georgia 30092
(770) 243-8356

**Peter Anderson**
Sutherland, Asbill & Brennan
999 Peachtree Street
Atlanta, GA 30308
(404) 853-8000

**Lee H. Zell**
Balch & Bingham LLP
1710 Sixth Avenue North
Birmingham, AL 35203
(205) 226-3494

**Jack Martin**
Martin Brothers PC
44 Broad St. N.W. - Suite 500\
Atlanta, GA 30303-2327
(404) 522-0400